IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JAMES L. DAVIS                                                    PLAINTIFF

v.                          Civil No. 09-3062

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                   DEFENDANT

## MEMORANDUM OPINION

Plaintiff, James Davis, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claim for a period of disability and disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act

(hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the

court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  *See* 42 U.S.C. § 405(g)*.*

## I.    Procedural Background

The plaintiff filed his applications for DIB and SSI on May 15, 2003 and August 5, 2003,

respectively, alleging an onset date of April 25, 1997, due to degenerative disk disease ("DDD"),

herniated disks, chronic pain, seizure disorder, and depression.  Tr. 80, 100, 133, 135-136.

Following denials of his application at the initial and reconsideration levels, Plaintiff then made

a request for a hearing by an Administrative Law Judge (ALJ).  An administrative hearing was

held on November 15, 2006.  Tr. 51, 911-952.  Plaintiff was present and represented by counsel.

At this time, plaintiff was 36 years of age and possessed the equivalent of a ninth grade education.[1]  Tr. 142, 148, 917-918.  He had past relevant work ("PRW") experience as a brick mason.  Tr. 16, 116-117, 126-127, 150-151, 186.

On May 25, 2007, the ALJ found that plaintiff's herniated disk, old compression fracture of the thoracic spine, and bilateral carpal tunnel syndrome were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 17.  However, he concluded that plaintiff's seizures and alleged mental impairments were non-severe.  The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") to perform a range of sedentary work involving stand and walking for two hours per day and only occasional fine manipulation, climbing, balancing, stooping, kneeling, crouching, and crawling.  Tr. 32.  With the assistance of a vocational expert, the ALJ found plaintiff could still perform work as a vehicle escort driver.  Tr. 31.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on January 12, 2009.  Tr. 5-8.  Subsequently, plaintiff filed this action.  ECF No. 1.  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  ECF No. 10, 13.

## II.   Applicable Law

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

--------

[1]Plaintiff has alleged to have had both a ninth grade education and an eleventh grade education.  Tr. 148, 918.

2

would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.    The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or

3

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.   **Evidence Presented:**

Records dated prior to the relevant time period indicate that plaintiff sustained a crush injury to his left foot in September 1992. Tr. 194-196. He was overrun by an 1800 pound buggy and noted immediate pain and swelling. Plaintiff was felt to have possible reflex sympathetic dystrophy and was scheduled for a symptomatic block , but declined due to uncertainty about the procedure. By December 1992, the swelling had subsided, but plaintiff remained tender in the mid-tarsal region dorsally. X-rays showed evidence of a navicular fracture, minimally displaced, which appeared to be healing. Tr. 194-195.

In January 1997, Plaintiff sought treatment for lower back pain with some occasional numbness, constant diarrhea, and feeling as though he were experiencing a nervous breakdown. Tr. 290, 492-493. Plaintiff related that he was involved in litigation against his wife for infidelity and incest with their young son, who had purportedly contracted genital herpes. By his report, Plaintiff had temporary custody of the child. He also indicated that he had been drawing unemployment and was an undercover narcotics informant. The doctor noted that he told a long and convoluted story with many unrelated, rambling thoughts that did not hold together. Plaintiff

4

then cried and complained of back and shoulder pain. He told the doctor that he could tell him what to give him and then requested Valium and Hydrocodone. However, the doctor prescribed Darvocet and Lorazepam. Tr. 290.

Plaintiff testified that he was involved in an automobile accident in April 1995, that exacerbated a previous back injury. Tr. 919-921. As a result, he reportedly suffered dislocated disks. Tr. 919-921.

On August 21, 1999, plaintiff was in jail when he reportedly experienced a seizure with loss of mentation, but no loss of bowl or bladder control. Tr. 275-279. Chest x-rays were normal as was a CT scan of Plaintiff's brain. Tr. 277, 278. Dr. David Young indicated that plaintiff did appear to be post-ictal. He ordered a Dilantin load and then prescribed Valium at discharge. Tr. 275-279.

Plaintiff was arrested again on August 24, 1999, and was transported to the hospital later that day due to another apparent seizure. Tr. 262-264. Plaintiff alleged that someone stole his medications while he was in jail. Shortly after his arrival at the hospital, he began jerking and shaking. This lasted approximately 30 seconds. Immediately thereafter, Plaintiff was awake, alert, and oriented. Five minutes later, he began jerking and shaking again. In the process, he hit a nurse. Plaintiff instructed the nursing staff to let him be, and then jerked and shook slowly, taking himself off the bed and onto the floor without striking his head or falling. Once on the floor, the jerking and shaking became more violent. Dr. Edwin Sherwood advised him to stop playing games and to get back on the table. Plaintiff returned to the table, but insisted that he was having a seizure. Dr. Sherwood diagnosed Plaintiff with pseudo seizures, as he doubted he

AO72A
(Rev. 8/82)

had true seizures.  No further seizure activity was observed and plaintiff was discharged home with a prescription for Dilantin.  Tr. 263.

On September 4, 1999, Plaintiff presented in the ER with complaints of shaking, chills, and feeling cold.  Tr. 265-274.  He thought he was having a reaction to a medication or that he had been poisoned.  Plaintiff thought someone had put strychnine in his hamburger.  Tr. 274. He was admitted through the ER with a temperature in the range of 105, a severe headache, and associated lower back pain.  Tr. 265.  A lumbar puncture was performed, which was clear. Plaintiff was admitted for observation of febrile response probably due to intravenous polysubstance abuse.  He had recently been incarcerated and had been under the care of Dr. Larry Killaugh who called in consultation referable to his seizure disorder. Medication adjustments were made during his admission.  A CT scan of his brain was normal.  His fever lapsed and a drug scree was positive for cocaine, cannabinoids, and codeine.  Although Plaintiff reported taking Dilantin regularly, his Dilantin level was 0.  Tr. 265-274.

On September 6, 1999, Dr. Peggy Brown examined Plaintiff.  Tr. 265-266.  He told her that he had been working for the Government trying to "bust" people taking drugs, but stated he could not tell her who his employer was.  When asked why he was not on a healthcare plan, Plaintiff admitted he did not work for the Government, rather claimed to work for the county. He reported a pain level off the charts, although he did not appear to be in any pain.  Dr. Brown suggested he be treated for withdrawals.  As he appeared to be requesting pain medication on a more than regular basis, she also suggested limiting the narcotics.  She prescribed a Haldol patch and Haldol to be given intermittently via IV along with the Rocephin.  Dr. Brown also ordered Librium to be given and continued until plaintiff was sedated, as she suspected his headache was

6

in large part due to withdrawals.  It was noted that Plaintiff had been treated by Dr. Ron Williams

in Little Rock for severe back pain.  Tr. 265-266.  A repeat MRI was performed and revealed a

herniated disk at the L5-S1 level.  Plaintiff was stabilized and requested discharge on September

11, 1999.  Tr. 266.

On October 11, 1999, Plaintiff presented for further evaluation of his back problems.  Tr.

258-261.  He described some tingling and numbness at times in his right leg, however, he denied

loss of bowel or bladder control.  Plaintiff stated that he had injured his back a long time ago and

was being followed by Dr. Jim Citty.  He indicated that an MRI showed several disks that were

impinging on the cord.  Some mild tenderness was noted in the sacroiliac areas, but his exam

was otherwise normal.  Dr. Randy Maddox diagnosed plaintiff with acute exacerbation of

recurrent low back pain and Lortab and Flexeril.  Plaintiff was told to follow-up with Dr. Citty.

Tr. 261.

On November 7, 1999, Dr. Sherwood examined Plaintiff at White County Medical

Center.  Tr. 254-257.  Plaintiff stated that he had thrown a pipe on top of his trailer to clean out

his chimney, but the pipe rolled off and hit him on the head.  He threw it again and, again, it

rolled off and hit him on the head, lacerating his right upper eyelid.  On the third attempt,

plaintiff managed to get the pipe to stay on top of the trailer and was able to climb up and clean

out his chimney.  However, on the way down, he stepped on a dead limb and fell, landing on his

back.  He reported some lower back pain and right lateral rib pain and had a superficial right

upper eye lid laceration that required sutures.  Plaintiff stated that he had a history of back pain

and usually took Valium and Lorcet, but he was out of both of these medications at present.

Some pain was noted in his right lateral ribs and lower lumbar spine, but no bruising or

AO72A
(Rev. 8/82)

lacerations were present in this area.  He exhibited a normal to fast gait without any evidence of pain.  X-rays of his chest and lumbar spine revealed no acute disease or fractures.  Tr. 257. Although plaintiff repeatedly asked for narcotic pain medication and initially refused Toradol, Dr. Sherwood advised him that Toradol would be the only medication given.  He offered plaintiff a prescription for Naprosyn, but he stated that he already has this medication at home.  Tr. 256.

On January 12, 2000, Plaintiff presented in the ER stating that he had discontinued his Dilantin several weeks prior.  Tr. 252-253.  As a result, earlier in the day, he fell to the ground, foaming at the mouth, and shaking all over.  This resolved, but his brother stated he would not wake up.  Upon arrival in the ER, plaintiff was awake, answering questions appropriately and complaining of a headache and some generalized aches and pains.  An examination revealed intact sensation, no focal deficit, symmetrical movements in all extremities, intact cranial nerves, and the ability to follow commands.  Plaintiff was administered Tylenol and Toradol for his headache and Fosphenytoin.  Dr. Prince diagnosed him with seizure disorder with medication noncompliance and prescribed Dilantin.  Tr. 253.

In September 2001, Plaintiff sought treatment at the same ER for recurrent back pain on at least six occasions. Tr. 237-251.  Each time, some tenderness was noted across his lower back, but x-rays were negative.  On September 21, Plaintiff complained of increasing back pain, in the midline of the lower sacral area.  Dr. Randy Maddox noted that Plaintiff refused to complete a list of his medications other than BC powder.  Tr. 237-239.  However, records indicated that he had already been prescribed Lortab, Flexeril, and Ultram in the month of September.  An examination revealed mild tenderness in the lower L5-S1 area, a negative straight leg raise, symmetric deep tendon reflexes, normal sensation, and normal upper and lower motor strength.

8

Plaintiff sat comfortably, walked without difficulty, and stood on his heels and toes.  As such, Plaintiff was diagnosed with acute exacerbation of chronic, recurrent back pain and probable drug seeking behavior.  Tr. 238.  Dr. Maddox administered injections of Toradol and Vistaril and prescribed a Medrol Dosepak and Naprosyn.  Tr. 238-239.

On September 23, 2001, Plaintiff returned to the ER with allegations of falling after his left leg gave out on him.  Tr. 234-236.  He stated that he was out of Vicoprofen.  Records indicate he had been prescribed 20 Naprosyn and a Medrol dose pack on the 21st, 30 Skelaxin on the 17th, 20 Ultram on the 16th, and 20 Lortab and Flexeril on the 7th.  Dr. Prince described Plaintiff's inconsistent physical findings as suggestive of no physical limits.  He did note that Plaintiff's motor strength showed a sudden loss of motor function, but then returned to normal within seconds.  Tr. 235.  Dr. Prince opined that this behavior strongly suggested Plaintiff was faking his symptoms since they did not fit into a known pattern for any related impairments.  Tr. 234-236.

On September 25, 2001, Plaintiff complained of lower back pain since 1999.  Tr. 305, 501, 733.  Recently the pain had become severe and his left leg had been going out on him without warning causing him to fall.  Dr. Citty prescribed Vicoprofen.  Tr. 305.

An MRI of Plaintiff's cervical and lumbar spine dated October 9, 2001, revealed a posterior annular fissure at the L5-S1 level.  Tr. 486.

On October 16, 2001, Plaintiff underwent his first epidural steroid injection ("ESI") with Dr. Juan Roma.  Tr. 794-796.  On October 19, 2001, Plaintiff indicated that the radicular component of his pain had markedly improved.  Tr. 793.  His primary complaint was that of lower back pain which prevented him from sleeping at this time.  Plaintiff had been given 20

9

Vicodin on Tuesday and had already taken all of them.  He was scheduled for a follow-up visit in approximately four days.  After some discussion, Dr. Middaugh decided to provide him with Roxicodone, this one time only, in the hopes that it would be less expensive than the Vicoprofen. He indicated that Plaintiff would need to confer with Dr. Michael Stone, his pain doctor, the following Tuesday to discuss future prescriptions.  Tr. 793.

On October 24, 2001, Plaintiff continued to report some improvement in his back and leg pain following his first epidural steroid injection.  Tr. 792.  He complained of difficulty sleeping, and reported taking four Percocet per day for pain and Ambien at night.  However, Plaintiff continued to work.  An examination revealed a positive straight leg raise test at 30 degrees on the left, 45 degrees on the right, and tenderness in the left lower back.  Dr. Michael Stone prescribed Percocet and Ambien.  Tr. 792.

On October 30, 2001, the findings of his physical exam had improved.  Tr. 789.  A second ESI was performed.  Tr. 790-791.  Dr. Robert Powers, an associate of Dr. Stone's also gave Plaintiff samples of Vioxx and a prescription for Percocet.  Plaintiff was given clear and explicit instructions that he was to receive no more narcotic pain medications after this prescription.  Tr. 790-791.

On November 5, 2001, Plaintiff felt the second ESI had been of some help in relieving his pain.  Tr. 788.  However, he complained that the Ambien was too expensive.  He requested Soma or more Percocet.  Dr. Dalby, an associate of Dr. Stone's prescribed 30 Percocet, gave him only 10 Soma to get him through the following week, and prescribed Restoril, as it was cheaper than Ambien.  Tr. 788.

10

On November 14, 2001, Plaintiff reported continued back pain arising from an old injury he sustained in a motor vehicle accident. Tr. 786-87. He still complained of pain which he rated as a seven to an eight on a ten point scale. Plaintiff indicated that the pain was 30-40% improved after his two previous epidural injections. An examination revealed a positive straight-leg raise at 40 degrees on the right and 20 degrees on the left and tenderness at the L5-S1 level. Dr. Stone administered Plaintiff's third ESI and prescribed Restoril and Hydrocodone. Tr. 786-787.

On November 18, 2001, Plaintiff stated that the Oxycodone was not helping his lower back pain. Tr. 781-782. He had two previous ESI's, the last one being transforaminal, but denied any relief. Plaintiff indicated that Restoril helped some with sleep and Soma was helpful with muscle spasms, although he had not taken it in a while. He reported problems getting medication secondary to money problems. A surgical consult was scheduled for December 21 with Dr. Chan to evaluate his options. Dr. Stone diagnosed Plaintiff with lumbar radiculopathy and explained the narcotic contract with Plaintiff. He accepted that the medications were addictive and understood the limits for use. Oxycodone, Soma, and Restoril were prescribed. Tr. 781-782.

On November 20, 2001, Plaintiff returned one week prior to his scheduled appointment with Dr. Stone. Tr. 783-785. He was treated by Dr. Brent Walker, Dr. Stone's associate. Plaintiff stated that his pain regimen was not working for him. Percocet had worked for him in the past, but he stated that this medication was too expensive. He wished to change to a generic Percocet. Dr. Walker changed him to Oxycodone with Acetaminophen and gave him a one-week supply until he could keep his regular appointment with Dr. Stone. Tr. 783-785.

11

On December 19, 2001, Dr. Stone noted that Plaintiff had been taking Oxycodone four times per day. Tr. 780. He had stopped the Restoril and Soma. Overall, his pain score was an eight to a nine on a ten point scale. Plaintiff was still working about two to three days per week. An examination revealed a positive straight leg raise at 20 degrees on the left and tenderness at the L4-5 and L5-S1 levels. Plaintiff denied excessive sedation or any problems with his thinking secondary to his medication. Dr. Stone diagnosed him with lumbar radiculopathy and noted that he was on chronic narcotics. Although Plaintiff had cancelled his surgical consultation, Dr. Stone encouraged him to undergo the assessment just to see if he was a candidate for surgery. He then continued him on Oxycodone. Tr. 780.

On January 30, 2002, Plaintiff conferred with neurosurgeon Dr. Patrick Chan. Tr. 483-485, 796B-796E. An examination revealed some tenderness in the area of the L5-S1 disk and with range of motion in the lower back. Dr. Chan noted that Plaintiff's records revealed degenerative disk disease at the L5-S1 level with minimum collapse and no compression. It does not appear that surgery was recommended. Tr. 483.

On February 6, 2002, Plaintiff complained of lower back pain and left leg pain and requested medication refills. Tr. 779. He indicated that he had been evaluated by Dr. Chan, a neurosurgeon, but Dr. Chan did not think he could do much for him. Plaintiff also acknowledged that he did not have any insurance. Dr. Stone noted Plaintiff's October 2001 MRI showing an L5-S1 level herniated disk. Dr. Stone agreed to refill his medications, but was told this would be the last time they were refilled early. He also changed Plaintiff to Hydrocodone and referred him for a consult with one of the neurosurgeons at UAMS. Tr. 779.

12

On March 6, 2002, Plaintiff stated that he had been out of pain medication for two days. Tr. 777-778.  He reported suffering from severe pain the previous Thursday, and being unable to work.  Plaintiff stated that the medication helped him very little.  On exam, Plaintiff was in tears.  He had a positive straight leg raise at five degrees on the left and 15 degrees on the right, and was tender at the L4-5 and L5-S1 levels.  Dr. Stone prescribed Methadone and Soma.  In exchange, Plaintiff returned his Hydrocodone script.  Tr. 777-778.

On April 8, 2002, Plaintiff had been unwilling to wait to see his primary pain clinic physician the previous Wednesday.  Tr. 776.  Dr. Robert Middaugh, an associate of Dr. Stone's, noted his history of problems with pain medication control.  He was also having trouble meeting his obligations with the clinic and was instructed that he had to behave in an appropriate and reasonable fashion in order to continue to be seen.  Dr. Middaugh diagnosed him with disk disease with radiculitis and prescribed Hydrocodone to last him until May 8, 2002.  Tr. 776.

On April 10, 2002, Plaintiff presented in Dr. Stone's office stating that he did not think his Hydrocodone was working.  Tr. 774-775.  He was very upset and crying.  There was really no way to examine him because he was so upset.  Dr. Stone stated that he would consider switching him back to Percocet if he would return his prescription for Hydrocodone.  Plaintiff stated he had it at home.  Dr. Stone explained that he would have to bring his remaining pills into the office and destroy them in the presence of a nurse before he could get a prescription for Percocet.  Due to the distance to his house, Plaintiff declined to do so and Dr. Stone refused to prescribe Percocet.  Plaintiff reported that he had an appointment with a neurosurgeon on May 2.  He also reported that he was going to attempt to obtain Medicaid.  Dr. Stone noted that Plaintiff had been instructed to see if he was a candidate for surgery, but had never pursued it.

13

He also indicated that Plaintiff phoned his office approximately twice per week wanting a change in medication or more narcotics.  He was instructed not to do this in the future, as he was becoming a problem for the nurses.  Dr. Stone advised him that if his pain was that severe, he would need to be seen in the ER.  He diagnosed Plaintiff with lumbar radiculopathy and maintained him on his Hydrocodone contract for which no prescription changes or additional refills were granted.  Tr. 774-775.

On June 20, 2002, Plaintiff reported continued lower back pain.  Tr. 305, 501, 733.  Dr. Citty noted that he was on a pain management program with Dr. Stone.  Dr. Citty prescribed Lorcet and Ambien.  Tr. 305.

On June 22, 2002, Plaintiff presented to White County Medical Center with complaints of mild neck pain and severe lower back pain.  Tr.  231-233.  He claimed to have been rear-ended in a car accident, but denied any trauma to his vehicle.  Dr. Sherwood noted that plaintiff was transported to the ER via private vehicle.  An examination revealed some mild tenderness to the middle cervical and lumbar spine.  However, no focal neurological deficits were evident and good strength in upper and lower extremities was noted.  Plaintiff's sensation was also intact. X-rays were negative.  Accordingly, Dr. Sherwood administered injections of Toradol, Nubain, and Morphine and gave him oral Lortab and Flexeril.  He then stated he was about to have a seizure and was given Ativan and Haldol via IV.  Plaintiff was later discharged with diagnoses of lower back strain and cervical strain and prescribed Toradol, Lortab, and Flexeril. Tr. 232.

14

On July 1, 2002, Dr. Citty called in a Lortab refill for Plaintiff.  Tr. 304, 500, 732.

However, an early refill request on July 23, 2002, was denied and not granted until July 31, 2002.

Tr. 302, 500, 732.

On August 14, 2002, Dr. Citty diagnosed Plaintiff with an anxiety reaction and prescribed

Buspar and Ambien.  Tr. 304.

On August 20, 2002, Plaintiff stated that he had injured his back while trying to change

a tire.  Tr. 228-230.  He reported some tingling in his left leg, but no weakness.  Plaintiff

indicated that he had been taking Hydrocodone without relief.  However, he was in no apparent

distress. Plaintiff was very mobile and able to stand out of bed without much limitation of

movement.  He demonstrated normal reflexes, sensation and cranial nerves. Tr. 228, 229.  Dr.

Prince diagnosed plaintiff with chronic lower back pain with acute exacerbation.   He

administered injections of Toradol and Vistaril and prescribed Zanaflex.  Tr. 229.

On September 7, 2002, plaintiff was transported to the ER via ambulance on a long spinal

board with a cervical collar in place.  Tr. 224-227.  Plaintiff was in jail and had complained of

severe neck and back pain.  He stated that he was not receiving his Dilantin or Lortab while in

jail.  Plaintiff denied any numbness or paralysis.  An examination did reveal some tenderness in

the musculature of the neck and across the lower back.  He was administered Dilantin in the ER.

X-rays of his lumbar and cervical spine were negative for acute fractures.  Tr. 227. Dr. Sherwood

told Plaintiff that he would need to see Dr. Citty for pain medication, as the ER would not give

him any further pain medication.  Tr. 225.

On September 11, 2002, Dr. Citty refused Plaintiff's request for pain medication refills.

Tr. 499.

15

On October 8, 2002, Plaintiff presented to the ER following two seizures. Tr. 215-219, 731. Plaintiff reported that one of his seizures lasted 20 minutes. Dr. Maddox noted that Plaintiff was last seen several days prior for chronic back pain. At this time, Dr. Sherwood indicated that plaintiff had requested pain medication, however, he was referred to Dr. Citty and told he would not receive any more pain medication in the ER. Plaintiff's judgment and insight were characterized as normal with normal mood and affect and full orientation. Tr. 218. He had a normal gait with a full range of motion about all his major joints. No tenderness, atrophy, effusions, or crepitation was evident. Dr. Maddox noted that he had never observed one of Plaintiff's seizures until that day. Tr. 215. Plaintiff reportedly began shaking his arms and legs and blinking his eyes, although he did not bite his tongue or exhibit tonic clonic activity. Plaintiff engaged in a running type of shaking of the lower extremities with one leg going up and one leg going down and his arms straight out. Tr. 218. This lasted about five seconds before Plaintiff appeared awake and not postictal. Following Plaintiff's return from the bathroom plaintiff claimed to have fallen and sustained a superficial laceration to his right upper eyebrow. Tr. 219. The report concluded the eyebrow and fall injuries were suspicious as possibly self-inflicted. Tr. 219. Dr. Maddox told Plaintiff that he would not give him any pain medication, and more significantly, that he did not believe plaintiff was experiencing seizures. Tr. 218. Plaintiff was diagnosed with a pseudo seizure, chronic back pain with drug seeking behavior, and an unwitnessed fall with superficial abrasion to the right eyebrow suspicious for a self-inflicted injury. Tr. 219.

On October 9, 2002, Plaintiff was admitted to the hospital for observation due to seizure disorder. Tr. 210-214, 220-223, 730. He had a history of tonic clonic seizure activity allegedly

16

witnessed by family members and a questionable history of pseudo seizure.  Following his release from the ER the previous day, he reportedly experienced increased seizure activity and falls and had passed out.  Plaintiff had purportedly fallen and struck the right side of his head.  Tr. 212.  Dr. Citty did note some abrasions on the right side of his forehead with a small hematoma.  His pupils were slightly pin point and sluggish.  Cerebyx was administered in the ER and Plaintiff was placed on bed rest.  A CT of plaintiff's brain was normal and an EEG revealed normal awake encephalogram test results.  Tr. 210.  He did screen positive for benzodiazepines and opiates.  Plaintiff was insistent on discharge the following day.  An appointment was made for him with Dr. Peggy Brown and he was discharged with prescriptions for Dilantin, Klonopin, and Lortab.  Dr Citty noted that Plaintiff was under pain management with Dr. Stone in Little Rock.  Tr. 211.

This same date, Plaintiff phoned Dr. Citty requesting a doctor's excuse so he could return to work.  Tr. 302, 498.

On October 28, 2002, Plaintiff's request for more Lortab was denied.  Tr. 302, 498.  However, he was prescribed Lortab on November 1.  Tr. 302, 498.

On November 26, 2002, Plaintiff presented at the ER with complaints of back pain.  Tr. 206-209.  Plaintiff claimed that he had fallen off a scaffold and landed with his back across a metal bar.  He rated his back pain as a nine on a ten-point scale.  Dr. David Young noted that plaintiff had a history of back pain and disk herniation at the L5-S1 level with narcotics abuse.  A back examination revealed no obvious abrasions or signs of injury, but some slight paraspinal tenderness in the left upper lumbar region.  Tr. 207.  Straight leg testing was negative, with no radiculopathy, no musculoskeletal weakness, normal neurological findings, and no ambulation

17

difficulties.  X-rays were also within normal limits.  Plaintiff was administered injections of Demerol and Phenergan.  He was then discharged with prescriptions for Skelaxin, Naprosyn, and Lortab.  Tr. 207.

The next day, Plaintiff returned to the ER stating that he had discovered a hematoma on his lower back and continued to experience pain.  Tr. 203-205.  He denied numbness or tingling in his lower extremities and still exhibited no difficulty ambulating.  Dr. Young noted a small hematoma in the mid-back area.  However, plaintiff's pulses, reflexes, sensation, and strength were all within normal limits.  Dr. Young explained that the Lortab, Naprosyn, and Skelaxin prescribed the previous day should be sufficient to control his pain.  Plaintiff was discharged with instructions to follow-up with Dr. Citty.  Dr. Young indicated that plaintiff walked out of the ER without any difficulty and with no neurologic signs or symptoms of significant disabling injuries.  He reported working for Donnie Davis Construction, but he also said he was disabled Tr. 70, 203-204, 302, 304A.

This same day, Plaintiff requested refills of Dilantin and Klonopin, stating he had been seen by Dr. Larry Killaugh at White County Detention Center.  Tr. 282.  Medication refills were denied.  Tr. 282.

On January 6, 2003, Plaintiff's sister phoned the White River Rural Health Center requesting medication refills for Plaintiff.  Tr. 281.  She stated that she needed them called into Wal-Mart so that she could pick them up and mail them to him.  Dr. Killaugh refused the request.  He stated that Plaintiff needed to be seen by the original prescribing doctor.  Tr. 281.

On January 7, 2003, Plaintiff again requested Klonopin and Dilantin refills.  Tr. 280.  He told the doctor at White River Rural Health Center that he was taking the Dilantin, but still had

18

a seizure. However, their records indicated that someone had just picked up 90 Klonopin for Plaintiff five days prior. Plaintiff denied having picked it up. Tr. 280.

This same day, Plaintiff presented at the Wal-Mart pharmacy requesting a "loan" on Klonopin. Tr. 281. He reported having suffered a seizure that morning, scraping his knuckles. The pharmacist indicated that he had contacted two other pharmacies used by Plaintiff and found that he had received 120 Klonopin on November 27, 2002, and 100 Klonopin on January 2, 2003. No medication was given. Tr. 281.

On June 30, 2003, Plaintiff requested medication refills. Tr. 295, 728. He also wanted to discuss the pain management clinic. Dr. Citty diagnosed plaintiff with chronic lower back pain and prescribed Lortab and Ambien. He was also administered Stadol and Phenergan injections. Tr. 295.

On July17, 2003, Plaintiff was loading a shotgun and discharged it into his left second toe. Tr. 322, 397, 401-404. He was admitted for incision and debridement and possible percutaneous pinning and antibiotic treatment. Following surgery, the alignment was nicely maintained. Dr. Shurnas believed the toe was viable. Tr. 322.

On July 22, 2003, Plaintiff's mother phone Dr. Shurnas and stated that she had made Plaintiff leave her home. Tr. 320. She indicated that Plaintiff had a drug problem, was receiving medication from several doctors, and was taking four to five medications at a time. Tr. 320. This same day, Plaintiff phoned requesting more pain medication. The nurse explained that Percocet had just been prescribed the previous day and that Dr. Shurnas would not be prescribing anything stronger than Percocet. Tr. 320.

19

On July 23, 2003, Plaintiff stated that he was having more pain in his foot and calf.  Tr. 320.  He had been weightbearing on his heel.  No swelling in the calf and no point tenderness were noted.  There was some soreness over the gastroc, but there were no changes in the appearance of his foot.  With sterile prep, Dr. Shurnas aspirated an old hematoma on the foot.  There was no purulence, just some eccymosis about the foot.  He felt it was just blast effect from the shock.  Plaintiff admitted that he had not been elevating his foot, rather was out having coffee.  Dr. Shurnas told him that he needed to go home, put his foot up, and stay in bed.  He prescribed Mepergan Forte, but indicated that he was running out of options to control his pain, given his narcotics abuse.  Tr. 320.

On August 4, 2003, Plaintiff was doing much better and having less pain.  Tr. 318.  His wound was clean, dry, and intact.  The swelling was mild and much improved, and the alignment was good.  X-rays showed good interval healing with good initial healing at the proximal phalanx.  Dr. Shurnas removed the pin and sutures and reapplied dressings.  Tr. 318.  He then prescribed Alprazolam and Mepergan Forte.  Tr. 319.

On August 8, 2003, Plaintiff called Dr. Citty's office requesting a refill of Hydrocodone because he did not have the money to go to Dr. Merrit's office.  Tr. 295, 728.

On August 11, 2003, Plaintiff presented at Dr. Shurnas' office stating that he had broken his toe and needed to see the doctor.  Tr. 318.  The nurse examined his foot and noted a small open area along the wound's edge.  This was cleaned with Peroxide and Plaintiff was given instructions for wound care.  Tr. 318.

On August 12, 2003, Dr. Shurnas noted that Plaintiff had stubbed his toe again, resulting in pain and swelling.  Tr. 315.  At this time, his mood and affect were appropriate.   X-rays

20

showed re-displacement of about 80-90%.  There was still some cortical contact.  Dr. Shurnas prescribed dressings to support the toe, continued Hydrogen Peroxide for the web space, and follow-up in two weeks for a recheck.  He also prescribed Antibiotics, Percocet, and Alprazolam to help him with sleep. Tr. 315.

On August 13, 2003, Plaintiff phoned Dr. Shurnas's office and indicated that he had been arrested for selling pain medication.  Tr. 318.  Plaintiff was given a prescription for Keflex, but no pain medication.  Tr. 318.

On August 15, 2003, Plaintiff's second and third toes were red with a small amount of drainage on the underside of the second toe around the wounds edge.  Tr. 315.  Plaintiff stated that he was taking his antibiotics, but could get no relief from pain.  He also reported that the jail had kept all his pain medication, and that his mother had thrown away the rest.  Tr. 315.  No pain medications were provided to Plaintiff.  Tr. 315.

On August 16, 2003, Plaintiff continued to have pain and swelling and was admitted with IV antibiotics and care, including moist heat and elevation.  Tr. 397-400.  The swelling resolved immediately, as did the erythema.  Laboratory studies also showed normal sedimentation rate and CRP, indicating minimal inflammation.  Plaintiff was given a course of IV antibiotics.  His room had to be searched by the police due to concerns for trafficking drugs.  Dr. Shurnas discharged him the following day.  Tr. 397-400.

On August 19, 2003, Dr. Citty refused Plaintiff's request for Lortab. Tr. 295.

On December 10, 2003, Plaintiff established care with Dr. Donald Wright. Tr. 288, 490-491.  He stated that he had recently moved from Searcy, where he was followed by Dr. Citty.  Plaintiff reported suffering from seizure disorder for seven years, stating that is was usually fairly

well controlled with medication. He indicated that his last seizure occurred approximately 2.5 months prior. Plaintiff also complained of chronic back pain for the past five years. He stated that he had seen a back specialist in Little Rock and was told his condition was inoperable. At this time, Plaintiff was working as a brick layer. Dr. Wright diagnosed Plaintiff with seizure disorder and warned Plaintiff about misuse of controlled substances. Tr. 288.

On December 15, 2003, Plaintiff complained of having experienced another seizure at work. Tr. 287, 489. He also stated that he had fallen on his back and injured his left thumb. He had a superficial abrasion in the lumbosacral spine region. Dr. Wright diagnosed plaintiff with seizure disorder. He prescribed an increased dose of Dilantin, Percocet, and local heat. Dr. Wright offered Plaintiff Robaxin, Flexeril, and Toradol, but plaintiff deferred. Tr. 287.

On February 11, 2004, Plaintiff reported no seizures in over six weeks. Tr. 286, 488. He was also able to work with pain medication. Dr. Wright diagnosed him with seizure disorder and chronic back pain and prescribed refills of Lortab, Dilantin, and Xanax. Tr. 286.

On March 8, 2004, Plaintiff indicated that he had not experienced a seizure in over a month. Tr. 285, 487. Dr. Wright diagnosed him with seizure disorder and chronic back pain and prescribed Lortab, Dilantin, and Xanax refills. Tr. 285.

On March 18, 2004, Dr. Citty wrote a letter indicating that he had treated Plaintiff on two occasions since April 2002. Tr. 293, 299, 300, 494-497. Dr. Citty admitted to treating Plaintiff on June 30, 2003, and February 24, 2004, for chronic lower back pain. In April 2002, Dr. Citty indicated that he had contacted Dr. Michael Stone in Little Rock to confirm Plaintiff's diagnoses of lumbar radiculopathy and chronic narcotic pain dependency. He stated that plaintiff's current working diagnoses were chronic lower back pain, seizure disorder, and drug dependency. In

22

February 2004, Plaintiff had a decreased range of motion in his extremities.  Tr. 299, 495.  It was Dr. Citty's understanding that Plaintiff worked as a brick layer, but had been unable to work in this manner due to his pain.  He did not have an occupational therapy evaluation or a significant medical evaluation to confirm his capability to perform his job.  Dr. Citty stated that he wrote narcotic prescriptions on a drug dependency contract on a monthly basis for which Plaintiff frequently requested refills.  It was his recommendation that Plaintiff receive an occupational therapy evaluation for his chronic lower back pain.  Tr. 293.

On April 15, 2004, Dr. Citty noted that Plaintiff's dentist had called with concerns about Plaintiff's Lortab use.  Tr. 298, 726.  Dr. Patterson had received a call from Plaintiff while he was in Memphis Dr. Citty indicated that he had just given plaintiff 18 Lortab on April 12.  Tr. 298.

On June 24, 2004, Plaintiff established care with Dr. Caleb Gaston.  Tr. 471, 505, 585, 675-677.  He needed blood work for his Dilantin, as well as pain medication refills.  Plaintiff indicated that he had undergone an MRI several years prior, revealing DDD and an inoperable back condition.  He had been to pain management and had epidural steroids without benefit. Plaintiff also complained of depression and frequent crying spells, although he denied any suicidal thoughts.  He stated that he had previously been a brick mason, but was currently on social security.  An examination revealed a positive straight leg raise on the left and an abnormal gait.  Dr. Gaston diagnosed plaintiff with DDD, chronic pain with depression, tobacco abuse, cirrhosis, seizure disorder, and anxiety.  He prescribed MS Contin, Lortab, Effexor XR, and Xanax.  Dr. Gaston also ordered lab work to check Plaintiff's Dilantin level.  Tr. 471.

On July 1, 2004, Plaintiff's liver function levels were high.  Tr. 682.

On July 2, 2004, Plaintiff returned for pain management with Dr. Gaston.  Tr. 467, 588, 673.  He stated that he had to take two MS Contin every four hours to get pain relief.  Plaintiff complained of a couple of episodes of blurred vision requiring the use of a patch over one eye.  He had never experienced anything like this before and wanted to go ahead with scheduling an MRI.  An examination revealed a normal gait, but pain with bending at the hips.  Dr. Gaston increased his MS Contin dosage and scheduled him for an MRI of his thoracic and lumbar spine.  He also recommended an opthamology evaluation and that Plaintiff not take the MS Contin so frequently.  Tr. 467.

On July 3, 2004, Plaintiff allegedly fell off the deck of his trailer while relieving himself.  Tr. 375-396, 561-584, 589-593.  Plaintiff sustained a left radial and ulnar distal fracture and a chest contusion.  Tr. 376.  Cervical and lumbar MRIs performed on July 12, 2004, revealed T5 and T7 compression fractures, with only mild disk bulging at L5-S1, without marked central canal or neural foraminal stenosis.  Tr. 374. Plaintiff was admitted for observation of pain control and slowly improved.  He was discharged home on July 6, 2004.  Tr. 561.

On July 12, 2004, Plaintiff presented at Dr. Shurnas' office requesting ACE bandages for his wrist.  Tr. 313.  He stated that he thought he had broken his left wrist again, trying to keep his mother from falling from a lawn chair.  He was advised to go to the ER, but refused.  Plaintiff scheduled an appointment instead.  Tr. 313.

This same date, an MRI of his thoracic and lumbar spine revealed T5 and T7 level compression fractures, acute edema, some edema in the T6 vertebral body, no loss of height in the T6 vertebral body, mild bulging of the disk at the L5-S1 level, and no marked central canal or neural foraminal stenosis.  Tr. 374, 560, 594.

24

On July 13, 2004, Plaintiff thought he might have re-injured his right arm.  Tr. 465, 596, 672.  He reported stumbling and catching himself.  He had also gotten his splints wet and now had some swelling underneath.  In addition, Plaintiff was out of Percocet and experiencing insomnia.  While in the hospital, he was given Restoril and indicated that it helped.  Dr. Gaston explained that he would prescribed Percocet this time, but Plaintiff needed to decrease his usage.  An examination revealed pain with palpation over both of his forearms.  Plaintiff was given Restoril, Ultram, and Percocet.  It was noted that Plaintiff had received Percocet, Vicodin, MS Contin, and Xanax on July 2.  Tr. 465.

On July 15, 2004, Plaintiff followed up with Dr. Shurnas regarding his bilateral distal radius injuries and thoracic spine compression fractures.  Tr. 312, 437.  His main complaint was his back.  MRI's showed the compression injuries, but CT scans showed no retropulsion.  There were compression fractures at the T-5 and T-6 levels that were stable.  X-rays of his left wrist showed maybe an old styloid fracture injury.  It did not appear to be acute.  Alignment was otherwise fine, but Plaintiff was tender over this.  On the right wrist, there was some dorsal angulation probably to about 10 degrees or perhaps 15, but minimal shortening when comparing both wrists with about 2 mm loss.  His thoracic spine was stable with continued evidence of compression fractures.  Dr. Shurnas noted no soft herniations or compressive problems and bulging did not appear to be severely compromised.  Dr. Shurnas indicated that Plaintiff was in no acute distress.  He discussed surgical consideration for Plaintiff's right wrist, but due to his back problems, Plaintiff opted for a short-arm cast.  Dr. Shurnas informed him that he could end up with additional wrist pain and require surgery in the future, and plaintiff agreed.  A short-arm cast was applied.  Wrist splints were prescribed for Plaintiff's left wrist, and he was to be

25

referred to Dr. Briggs or another spine surgeon concerning his back.  Plaintiff was to be non-weightbearing on the right wrist, but could use the left as tolerated in the splint.  Tr. 312.

On July 22, 2004, Plaintiff complained of continued right arm pain and lower back pain. Tr. 462, 599, 669.  He was already out of MS Contin.  Dr. Gaston explained that he would not refill his pain medications early.  He was advised to take his medications as prescribed or else he would endanger the patient physician relationship.  Plaintiff did indicate that the Ambien did not help him rest.  He requested Restoril instead.  Plaintiff was given 30 Restoril tablets.  Tr. 462.

This same date, Dr. Gaston completed a medical assessment of ability to do work-related activities.  Tr. 327-328.  He indicated that Plaintiff could lift 5 pounds frequently and 10 pounds occasionally due to two compression fractures.  Dr. Gaston limited Plaintiff to standing and walking uninterrupted for ten minutes for a total of one hour in an eight hour workday.  He also opined that Plaintiff could sit uninterrupted for one hour for a total of six hours in an eight hour workday.  Dr. Gaston concluded that plaintiff could not climb, kneel, crouch, stoop, balance, or crawl; would experience limitations with reaching, handling, feeling, speaking, seeing, and hearing due to spinal function; and, could not work near moving machinery.  Tr. 327-328.

On July 24, 2004, Plaintiff underwent examination with Dr. Jennifer Sadler.  Tr. 369-372, 557-558.  Plaintiff reported that he had recently re-injured his back and was out of Ms Contin, Percocet, Hydrocodone, Xanax, Effexor, and Dilantin.  He stated that he had forgotten to ask Dr. Gaston for refills.  Dr. Sadler explained that she would be glad to give Plaintiff something for pain, but declined to refill his medication.  He requested a shot of Demerol.  When Dr. Sadler offered him Toradol, he stated that it did not work and refused the medication.  She offered to

26

give him a script for Ultram to tide him over until he could see Dr. Gaston on Monday, but Plaintiff became very angry and demanded narcotics. Dr. Sadler diagnosed plaintiff with possible drug seeking behavior. Tr. 371-372.

On July 28, 2004, Plaintiff requested a refill of mediation. Tr. 462, 599, 669. Again, Dr. Gaston reinforced that he would not refill these medications until August 2. Plaintiff indicated that his back and arm seemed to be improving since his fall. His mother also voiced her belief that the Effexor was beginning to help him as well. Plaintiff was given 30-day prescriptions for MS Contin, Lorcet, and Xanax. Tr. 462.

On August 3, 2004, Plaintiff reported continued wrist pain. Tr. 436. His short arm fiberglass cast was secure and intact. Neurovascularly, he was intact with exposed digits. X-rays of plaintiff's right wrist showed an obvious increase in deformity. Tr. 366. Dr. Oliver was of the opinion that plaintiff would require an osteotomy, dorsal plating, and bone grafting. Tr. 436.

This same date, Plaintiff phoned Dr. Gaston's office stating that he had been prescribed Lortab 500 milligram, but could not take this dosage due to existing liver damage. Tr. 461, 668. Dr. Gaston stated that he would be okay taking this dosage for that month, but that he would switch to Norco 325 milligram the following month. He also authorized a prescription for Ambien, but advised Plaintiff he could not take Temazepam (Restoril) with the Ambien. Tr. 461.

On August 5, 2004, Plaintiff phoned Dr. Gaston's office requesting Restoril and Ambien. Tr. 460, 667. It was explained that he did not need both medications. Tr. 460.

27

On August 8, 2004, Plaintiff phoned Dr. Gaston's office, stating that his pain medications had been stolen. Tr. 459, 666. He indicated that he had filed a police report. However, Plaintiff was reminded of his pain contract and told that refills were not advisable at this time. Tr. 459.

On August 6, 2004, Plaintiff underwent open reduction and internal fixation of the right distal radius fracture, as well as closed reduction of the left radius fracture. Tr. 360-364, 547-555.

On August 11, 2004, Plaintiff stated that he was going to the detective's office because his brother had stolen five days worth of his medications and ingested them. Tr. 459. His brother was taken to the ER for blood work and then arrested. Dr. Oliver refused to prescribe Percocet, but it was cleared for him to prescribe other medication. Tr. 459. At this time, Plaintiff reported that his right hand was swollen to the size of a football. Tr. 459.

On October 11, 2004, Plaintiff phoned Dr. Gaston's office for medication refills. Tr. 458. He was transferred to the appointment desk and scheduled for an appointment on August 20. However, records indicate that he did not keep this appointment. Tr. 458.

On August 23, 2004, Plaintiff obtained narcotic replacements by presenting Dr. Gaston's office with a police document he had obtained after reporting that his MS Contin, Xanax, and Lortab had been stolen. Tr. 457, 604, 654, 664. As the papers did appear to be legitimate, Plaintiff was given medication refills for six days, as requested. He was advised to see Dr. Gaston for further prescriptions. Tr. 457.

On August 24, 2004, Plaintiff continued to report severe pain. Tr. 435. He spent ten minutes discussing all of his chronic pain medication issues, from his alleged chronic back disability to indicating that Demerol worked better than the other medications his family doctor

28

had prescribed, but that Medicaid would not pay for it and asking Dr. Oliver if he would "get him some." Dr. Oliver noted that plaintiff's wrist splint was quite abused, but intact. He was moving his fingers around nicely and pronating. An examination of the wrist showed a healed wound with some mild erythema around the staples, but nothing else. Plaintiff was quite stiff and did have some diffuse numbness palmarly, but this was chronic for him due to a prior burn on the upper arm. X-rays showed a slight loss of alignment in the left wrist with dorsal tilt of about 10 degrees. The hardware in the right wrist was in place and maintaining acceptable alignment. Dr. Oliver removed the staples from the right wrist and placed it into a short arm cast. Keflex was also prescribed due to superficial erythema. Based on his history, he believed plaintiff's left wrist would be acceptable. Tr. 435.

On August 25, 2004, Plaintiff complained of swelling in his right upper extremity. Tr. 455, 606, 662. He had also developed chills and pain. Dr. Gaston noted that he had been started on Keflex the previous day. Plaintiff indicated that he was having to use more MS Contin and Lorcet because of the increasing pain. Dr. Gaston discussed Plaintiff's increasing of his pain medication dosage without first consulting him. He was advised that this jeopardized the patient-physician relationship. Dr. Gaston gave Plaintiff and injection of Rocephin and advised him to continue with his current dosage of MS Contin. He also switched Plaintiff from Lorcet to Percocet until this acute exacerbation of pain had passed. Tr. 455.

On August 27, 2004, Plaintiff was admitted to the hospital due to postoperative right forearm cellulitis and abscess formation. Tr. 344-352, 454, 531-546, 608-611, 661, 685-686. The wound was lavaged and debrided. On August 31, 2004, Plaintiff again underwent irrigation

AO72A
(Rev. 8/82)

and debridement.  Tr. 434.  His condition then improved.  He was discharged home on September 8, 2004, with MS Contin and Levaquin.  Tr. 344-352.

On September 10, 2004, after being denied requests for a Lorcet refill on September 8 and 9, Plaintiff presented at Dr. Gaston's office in tears, stating that his mother had thrown out what was left of his MS Contin.  Tr. 452, 453, 658, 684.  Records indicate he had plenty of Percocet at home.  However, Plaintiff said he felt like he was going to die with pain.  Dr. Gaston agreed to make an exception this time, due to plaintiff's arm fractures and recent surgery. He advised Plaintiff to be more responsible in the future, as this would not happen again.  Tr. 452.

On September 14, 2004, Plaintiff was doing well.  Tr. 433.  His pain had drastically improved.  The wound looked completely granulated over with granulation tissue.  Some purulent draining was noted on the dressing, but Dr. McBride thought it was strictly from the granulation tissue.  Plaintiff had some mild dorsal tilt and his right wrist was in good position with a callus around the fracture zone.  Therefore, his cast was removed and he was placed in a VCU. Antibiotic ointment and clean dressings were prescribed to treat his right wrist.  Tr. 433.

On September 22, 2004, Plaintiff missed an appointment with Dr. Gaston, but sought to pick up his Percocet prescription.  Tr. 451.  He was informed that he would need to schedule an appointment.  An appointment was scheduled for the following day.  Tr. 451.

Doctors admitted Plaintiff to Baxter Regional Medical Center for further treatment of his wrists from September 25, 2004, through October 1, 2004.  Tr. 329-342, 517-530.  The hardware in his wrist had become infected.  Plaintiff underwent hardware removal and incision with debridement of his right wrist. Tr. 330.  He was treated with antibiotics and his swelling and erythema completely resolved resulting in good wrist function upon discharge.  Tr. 330.  Plaintiff

30

was released home with home health services for wound care.  Tr. 332, 405-422.  Dr. Oliver noted that Plaintiff was a noncompliant patient.  Tr. 523.

On October 4, 2004, Plaintiff presented at Dr. Gaston's office to discuss his medications. Tr. 450, 654, 688.  Dr. Gaston explained that he was only a family physician, not a pain specialist.  He advised Plaintiff that he must see a pain specialist in order for Dr. Gaston to continue prescribing his medications.  He offered Plaintiff some alternatives to taking pills, and Plaintiff wanted to try the Duragesic patch.  Plaintiff was referred to Dr. Cannon with a recommendation that an implantable morphine pump be considered.  Dr. Gaston then prescribed Duragesic and Norco.  The Ms Contin was discontinued.  Tr. 450.

On October 7, 2004, Plaintiff's right wrist looked great.  Tr. 432.  There was minimal swelling, no erythema, and no drainage.  X-rays showed acceptable alignment and healing. Plaintiff was to finish out the IV antibiotics and then begin six weeks of Keflex.  Tr. 432.

On October 20, 2004, Dr. Anthony McBride reported on follow-up examination that Plaintiff's right wrist infection was responding reasonably well.  Tr. 431.  Plaintiff's only restriction was to continue wearing the wrist splint and "avoid heavy lifting."  X-rays revealed healed fractures with abundant bone and reasonable overall position.  Tr. 431.

On October 21, 2004, Plaintiff indicated that the Duragesic patch had done well for him, but caused nausea beginning in the second week of use.  Tr. 449, 655, 689.  He had been using Norco instead of the patches.  Dr. Gaston reiterated that he was not a pain specialist and advised Plaintiff that he would not refill the Norco.  He then diagnosed Plaintiff with chronic back pain, opioid dependence, chronic anxiety, and depression with chronic pain.  He prescribed MS Contin, Xanax XR, Xanax, and Effexor.  Tr. 449.

31

On October 27, 2004, Plaintiff called Dr. Gaston stating that he was out of Lorcet and had stopped using the patches due to nausea. Tr. 448, 690. Dr. Gaston refused his refill request. Tr. 448, 657.

On November 1, 2004, Plaintiff complained of residual back pain and anxiety. Tr. 447, 656, 691. He did state that the long-acting Xanax helped with his anxiety, but still had to use the short acting to help him sleep some nights. Dr. Gaston discussed with him the option of pain management, including the possibility of an implantable Morphine pump. An examination revealed pain with range of motion in Plaintiff's spine, including bending over to touch his toes. Dr Gaston prescribed MS Contin, Norco, Xanax XR, and Xanax. Tr. 447.

On December 1, 2004, Plaintiff told Dr. Gaston that his depression symptoms were relapsing due to pain and requested medication refills. Tr. 445, 652, 694. He indicated that his back pain was decreasing, but not completely under control. Plaintiff also stated that the anxiety medication was doing a good job of controlling his symptoms. Due to increased depression and crying spells, he requested a return to Effexor-XR. Plaintiff was also interested in quitting smoking and requested Nicotine gum. Dr. Gaston refilled Plaintiff's MS Contin, Norco, and Xanax and prescribed Effexor-XR and Nicorette. Tr. 445.

On December 8, 2004, Plaintiff sought treatment for fever, sore throat, and vomiting. Tr. 651, 695. However, he also requested something to take short-term for his headache. Dr. Gaston reiterated his pain policy. Plaintiff was given Phenergan, Percocet, and Robitussin AC. Tr. 651

On December 15, 2004, Plaintiff had recovered from the infection in his right wrist, but was having diffuse pain and numbness in his hands. Tr. 430. There was no significant swelling

32

over the right wrist and his surgical scar was well healed.  Dr. McBride diagnosed plaintiff with

bilateral wrist fractures possibly causing carpal tunnel syndrome.  He advised Plaintiff to proceed

with nerve conduction studies.  Plaintiff requested pain medication and sleeping medication, but

Dr. McBride refused him.  Plaintiff was advised he would have to get all of his medication from

his family doctor.  Tr. 430.  Nerve conduction studies were performed on December 28, 2004.

Tr. 283.  The results were consistent with bilateral carpal tunnel syndrome, right greater than left,

and severe left ulnar nerve slowing at the elbow.  Tr. 283.

On January 5, 2005, Plaintiff phoned Dr. Gaston's office with complaints of migraine

headaches and seizures.  Tr. 444, 649, 697.  He stated that his son's Phenergan helped his

headaches and requested a prescription.  Plaintiff was advised not to take anymore of his son's

Phenergan.  A prescription for Plaintiff was called in.  Tr. 444.

On January 11, 2005, Plaintiff asked to switch back to Dr. Oliver's services.  Tr. 429. Dr.

Oliver agreed to see him.  Plaintiff scheduled an appointment, but failed to show.   Tr. 429.

On January 13, 2005, Plaintiff complained of having experienced a "couple" of seizures.

Tr. 441, 648.  His Dilantin level was below detectable, and Plaintiff indicated that he was ready

to restart Dilantin.  He also stated that his anxiety seemed to be getting worse.  Plaintiff felt like

the Xanax was not helping him anymore.  He had taken Valium in the past and Dr. Gaston stated

he could try switching back when he was due for his next refill.  Dr. Gaston noted that Plaintiff

had both of his carpal tunnel braces on at this time.  He then increased his Effexor XR and

Dilantin dosages.  Tr. 648.

On January 25, 2005, Plaintiff sought early refills for his medications claiming he hurt

his back and had been taking extra medication.  Tr. 441, 648, 698. His Dilantin level remained

AO72A
(Rev. 8/82)

low, so Dr. Gaston increased his dosage. Tr. 679. Plaintiff was warned and advised that the medications would not be refilled until February. He was given postdated prescriptions for Norco, Xanax, and MS Contin. Tr. 441.

On January 28, 2005, Plaintiff called requesting that his Dilantin dosage be increased. Tr. 647. Records indicate that a prescription was faxed over to the pharmacy on February 1, 2005. Tr. 647.

On February 2, 2005, Plaintiff phoned and spoke to Dr. White, who was on call for Dr. Gaston, regarding his seizures. Tr. 647. No medication changes were made. Tr. 647. Plaintiff was notified that he did not need to be driving and needed to keep his lab appointment. Tr. 647.

On February 3, 2005, Plaintiff called with complaints of chest pain. Tr. 647, 701. He said he was not certain it was his heart, but wanted a call back. He reported chest pain off and on for two to three months. However, he was not experiencing pain at that time. Plaintiff was also concerned he could have Parkinson's because he was tired all the time and had the shakes. Dr Gaston advised him to schedule an appointment and explained that his symptoms were likely due to his high dosages of medications. Tr. 647.

On February 12, 2005, Plaintiff phoned Dr. Gaston's office reporting seizures. Tr. 644. He was advised to go to the ER. Tr. 644, 702.

On February 14, 2005, Plaintiff phoned Dr. Gaston's office for medication refills. Tr. 644, 705. Plaintiff was advised to go to the ER, as there was nothing Dr. Gaston could do for him. Dr. Gaston refused to call in anymore pain medication. Tr. 644.

On February 22, 2005, an early refill request was again denied. Tr. 705.

On February 23, 2005, Plaintiff's Dilantin level remained too low.  Tr. 678, 703.  Dr. Gaston questioned whether he was taking his medication and Plaintiff denied any missed doses. Tr. 678.

Again, on February 25, 2005, Plaintiff requested pain medication refills.  Tr. 644.  Dr. Gaston advised that he would not receive any early refills.  He was advised to keep his appointment.  Tr. 644.  However, Plaintiff requested that his appointment be cancelled because he was over his Medicaid limit for appointments until July.  Tr. 644.

On February 28, 2005, Plaintiff requested a prescription for Effexor, as well as post dated scripts for his other medications.  Tr. 645, 704.  Dr. Gaston increased his Dilantin dosage and gave Plaintiff a new prescription.  However, refills on the remaining medications were not authorized until March 1, 2005.  Tr. 645.

On April 5, 2005, Plaintiff apparently passed out in a Wal-Mart restroom.  Tr. 509-516, 641, 707-711.  He refused to go to the ER, so was taken to Dr. Gaston's office.  Dr. Gaston sent Plaintiff to the ER.  His urine toxicology screen was positive for opiates and benzodiazepines. It was believed that Plaintiff was over medicating, as there were reports he was missing MS Contin from his usual monthly dosing.  Nevertheless, he was admitted to the ICU.  Narcan was administered shortly after his admission and marked improvement in his mental status was noted. His pupils went from very small to dilated and he complained of a headache.  It was suspected that this marked response was evidence of an overdose on his prescribed narcotics, although Plaintiff denied using more than had been prescribed to him.   That evening, nurses observed Plaintiff experience what was thought to be a generalized seizure.  Lab tests revealed that his Dilantin level was low, evidencing noncompliance.  Tr. 509.  Plaintiff was given Fosphenytoin

35

and a therapeutic level of Dilantin was obtained.  He was felt to be stable and discharged the following day.  Plaintiff was given a prescription for Dilantin.  Tr. 510.

On April 7, 2005, Plaintiff called and informed Dr. Gaston that he had moved out of his mother's home and wanted Dr. Gaston to schedule him an appointment with a neurologist.  Tr. 641.  He wanted to wait on seeing a pain specialist until after he had been evaluated by the neurologist.  Tr. 641.

On April 29, 2005, Plaintiff requested refills of Dilantin, Diazepam, Morphine, Hydrocodone, and Effexor. Tr. 642, 712.  Dr. Gaston explained that he would need to schedule an appointment to receive any refills.  Tr. 642.

On May 5, 2005, Plaintiff complained of right lower abdominal pain for two weeks.  Tr. 714.  He denied any nausea or changes in his bowel habits.  Plaintiff stated that this seemed to get worse with meals.  He also requested pain medication refills.  Dr. Gaston noted that Plaintiff had an initial visit with the pain management doctor who wanted to put him on six months of physical therapy before considering a pain pump.  He then opted to watch Plaintiff's abdominal pain for another two weeks, refilled his medications, and referred him to a neurologist concerning his seizure disorder.  Tr. 714.

On May 10, 2005, Plaintiff phoned Dr. Gaston for a referral for carpal tunnel surgery.  Tr. 716.  He also requested a refill of Xanax.  The nurse explained that Dr. Gaston did not feel that Plaintiff needed a refill at that time.  Plaintiff stated that he did not have a problem.  It was suggested that he schedule an appointment to discuss this issue with Dr. Gaston.  In an angry voice, Plaintiff indicated that he would schedule an appointment and hung up abruptly.  Tr. 716.

On May 12, 2005, a CT scan of Plaintiff's abdomen and pelvis revealed a small right renal calculus with normal kidney function.  Tr. 639, 717.

On June 1, 2005, Plaintiff requested medication refills.  Tr. 716.  Dr. Gaston indicated that he could not pick up prescriptions until June 3, as his current 30 day prescriptions did not run out until June 4.  Tr. 716.

On June 9, 2005, Plaintiff requested one last month refill for July because he was unable to get in to see Dr. Cheeney until August 5.  Tr. 508, 718.  After verifying his appointment with Dr. Cheeney, Dr. Gaston approved refills for July only.  Plaintiff was to call back at the end of the month and scripts would be written.  Tr. 508.

On July 3, 2005, Dr. Gaston refused to give Plaintiff any further refills, as he was no longer a patient.  Tr. 719.

On August 5, 2004, Plaintiff established care with Dr. Lori Cheney.  Tr. 807.  He reported experiencing a seizure the previous day because he had been out of Dilantin since August 1.  Plaintiff was also out of pain medication.  He relayed his medical history to Dr. Cheney, stating that his fall from his deck in 2004 was due to a seizure.  Plaintiff admitted that his Dilantin level was always low.  Dr. Cheney advised him that he must be seizure free for at least one year before he would be allowed to drive.  She diagnosed him with a history of DDD of the lumbar spine, hepatitis C from a blood transfusion in 1989, seizure disorder, and a left foot fracture.  Dr. Cheney increased his MS Contin dosage and prescribed Norco, Dilantin, and Xanax.  She ordered lab work to check his liver function and his Dilantin level, and indicated that she would obtain his medical records to review his MRI results.  Tr. 806.

37

Dr. Cheney's office attempted to make him an appointment with Dr. Robbins, but were informed Plaintiff's account had been sent to collections, so he could not be seen.  Tr. 806.

On August 29, 2005, Dr. Cheney prescribed Xanax, MS Contin, Norco, and Dilantin. Tr. 806.

On September 2, 2005, Plaintiff asked to try Lunesta.  Tr. 806.  Dr. Cheney authorized the switch, but stated if it worked, he would need to wean off Xanax.  Tr. 806.

On September 19, 2005, Plaintiff phoned Dr. Cheney's office stating that he had been helping his son unload his motorcycle when he pulled a muscle in his back.  Tr. 805.  He requested that Dr. Cheney place him in the hospital for pain management.  Plaintiff was offered an appointment, but Plaintiff refused.  He opted to just keep his appointment for the following Thursday.  Tr. 805.

On September 22, 2005, Dr. Cheney noted that, even before reinjuring his back, the MS Contin and Norco did not keep him comfortable.  Tr. 805.  He was not sleeping well and had experienced a seizure that month.  Dr. Cheney diagnosed him with acute lower back pain with chronic lower back pain.  She noted that he needed a pain specialist, but went ahead and prescribed Soma and gave him post dated prescriptions for Norco and MS Contin.  Tr. 805.

On November 14, 2005, Dr. Cheney's nurse advised Plaintiff that he must not get his pain medications refilled early and that he could not just keep requesting changes to his medications or he would be dismissed from their clinic.  Tr. 804.  Dr. Cheney noted that Plaintiff's MRI results were not severe enough to explain Plaintiff's degree of pain.  She told him that he would need to undergo repeat MRI's before she made any further changes to his medications.  Dr. Cheney then prescribed MS Contin and Xanax.  Tr. 804.

38

On December 20, 2005, Plaintiff reported a cough with a fever for at least two days. Tr. 803. He complained of so much pain in his lower back that he could hardly stand it. Plaintiff had undergone ESI's in the past, but they had not helped. He reported experiencing 4-12 seizures per month, but had not seen a neurologist in 10-12 years. Plaintiff also reported having a 15% disability on his left ankle and a 25% disability rating on his right shoulder. Further, he complained of his hands cramping and going numb. Tr. 802. He told Dr. Cheney that he had been diagnosed with carpal tunnel syndrome and could no longer work due to the pain. She diagnosed him with chronic lower back pain with minimal disk disease. He was reportedly taking six Ibuprofen and Methadone daily, as he had run out of his other medications. Dr. Cheney indicated that he might need a pain clinic evaluation. She also diagnosed him with uncontrolled seizure disorder, noting he had failed to have his most recent lab tests performed. Dr. Cheney noted Plaintiff's history of hepatitis C and ordered lab work to evaluate his liver function. She also diagnosed him with depression and prescribed Cymbalta. Due to bronchitis, Plaintiff was also prescribed Zithromax. Tr. 802.

On December 22, 2005, Dr. Cheney's office attempted to schedule Plaintiff an appointment with Dr. Oliver, but were unable to do so because Plaintiff had been dismissed by Dr. Oliver for noncompliance. Tr. 802. They also attempted to schedule him an appointment with Dr. Chan, but were told Plaintiff would not be seen unless his balance was paid in full. Tr. 801.

On December 23, 2005, an MRI of Plaintiff's lumbar spine revealed a small central disk herniation at the L5-S1 level. Tr. 636, 815. An MRI of his thoracic spine showed old

39

compression injuries at the T5 and T7 levels with no acute injuries noted or soft-tissue herniation apparent.  Tr. 637, 815.

On January 12, 2006, Plaintiff's Dilantin level was too low.  Tr. 813.  Dr. Cheney questioned whether Plaintiff was being compliant with his medication.  Plaintiff stated that he was in the hospital on a Dilantin drip and his levels remained low.  Tr. 813.

On January 24, 2006, Plaintiff presented at Dr. Cheney's office stating that he had experienced a seizure two weeks prior and that his back was killing him.  Tr. 801.  However, he went home before the doctor could see him.  X-rays revealed compression injuries that appeared to involve the T5 and T7 levels.  Tr. 814.  The injuries did appear old with no paravertebral soft swelling.  Significant angulation was not seen.  On January 27, Dr. Cheney called in a prescription for Toradol.  Tr. 801.

On February 1, 2006, Plaintiff requested Soma for night time use.  Tr. 798.  Dr. Cheney noted he had one seizure in the previous month and reported taking Dilantin as prescribed.  She noted that his Xanax and Methadone prescriptions were also due.  Plaintiff was given 60 Xanax, 150 Methadone, and 30 Soma.  Tr. 798.

On February 8, 2006, Plaintiff picked up post dated prescriptions for Xanax and Methadone from Dr. Cheney's office.  Tr. 801.

On June 1, 2006, Plaintiff continued to experience mid-back pain.  Tr. 799.  He stated it felt like he had broken it all over again.  Records indicate that he was scheduled for another injection the following week.  Tr. 799.

On June 5, 2006, Plaintiff was still not complaint with his Dilantin.  Tr. 799-800.  He was reportedly experiencing a lot of mid-back pain, but was also trying to exercise.  Plaintiff

40

indicated that he was taking five Methadone per day with two at bedtime, which made it tolerable most days.  His last seizure was approximately a week and a half prior to this appointment.  He stated that he was only taking Dilantin four times per day as higher doses caused headaches.  Plaintiff had also tried Topamax, but this caused his arms to go numb.  Dr. Cheney increased his Dilantin dosage, referred him to a neurosurgeon, and prescribed Xanax and Methadone.  Tr. 799.

On July 10, 2006, Plaintiff presented in Dr. Citty's office for chronic pain management. Tr. 725.  Dr. Citty indicated that he had reviewed Plaintiff's previous medical records and would continue Methadone.  Tr. 725.

Plaintiff was hospitalized for a series of drug overdoses in 2006. He was found non-responsive following an apparent overuse of narcotics on August 3, 2006. Tr. 623-634. Plaintiff passed out while seated on a toilet and dropped a number of pills on the floor.  He came to and found his mother gathering his pills, so he apparently grabbed his medications and ran into the woods.  Plaintiff later returned to the house and lost consciousness again.  According to Plaintiff's brother-in-law, Plaintiff had stashes of Methadone and "who knows what other drugs." Tr. 624. When EMS arrived, Plaintiff was unconscious with a pulse oximetry in the 50s. He was given Narcan and began having obvious signs of withdrawal, but did not ever completely wake up.  He was transported to the ER.  On initial evaluation, Plaintiff was nonresponsive.  Due to potential airway compromise, it was felt Plaintiff needed to be intubated.  His pulse oximetry then went up to 100%.  Dr. Sandler admitted Plaintiff to ICU on a Diprivan drip.  Dr. Warr noted that Plaintiff's Dilantin level was subtherapeutic and that he was known to be noncompliant with his medications.  He was loaded with Dilantin and watched overnight.  His physical exam

41

remained overall unremarkable and his vital signs were stable upon discharge the following day. Tr. 623.

On September 25, 2006, Dr. Citty refilled Plaintiff's Methadone to treat his chronic lower back pain. Tr. 722. He noted that this prescription was to last him 30 days. Tr. 722.

Plaintiff was admitted to St. Vincent Health Center from October 2, through October 16, 2006, for alleged severe depression and an overdose of Methadone and Ambien. Tr. 612-621, 764-773. It was noted that plaintiff had been on Morphine and OxyContin, taking 80 milligrams three times a day for a long period of time. Plaintiff had no prior psychiatric history, but claimed a long history of treatment for chronic pain. Many of Plaintiff's cognitive abilities remained intact. Tr. 612. Plaintiff was alert and oriented and his memory was good for recent and remote events. Tr. 612. Despite depressed mood and a flat affect, he exhibited normal motor movement and intellectual functions were within normal limits. Tr. 612. Judgment and insight were poor and impulsivity was moderate to high. Plaintiff was admitted to Living Hope Institute and underwent a thorough biopsychosocial evaluation. He was continued on Dilantin, Ambien, and Xanax. On October 2, Flexeril was prescribed, as was Darvocet. However, Darvocet was later discontinued in favor of OxyContin. By October 5, Plaintiff had resumed his 80 milligram dosage. Lexapro was started on October 4, but changed to Zyprexa on October 12. He responded well and Carbamazepine was also reinstated. Plaintiff was diagnosed with severe, recurrent depression and DDD. His GAF was assessed at 16 on admission and 45 on discharge. Plaintiff was released home on October 16, on Xanax, Carbamazepine, Flexeril, Lexapro, Zyprexa, Dilantin, Ambien, and OxyContin. Tr. 612-621.

42

On February 8, 2007, Plaintiff returned for medication refills. Tr. 852-856. He noted that his chronic back pain and seizure disorder were worse when he did not take his medication and better when he took his medications routinely. Dr. Sherwood refused to refill Plaintiff's Oxycontin and Xanax, but refilled his Dilantin and Tegretol and prescribed him a few Tylox. Tr. 852-856.

On October 11, 2007, Plaintiff was admitted to St. Vincent Behavioral Health due to depression and suicidal ideation. Tr. 902-910. He was tearful, extremely depressed, and expressed suicidal ideation. Plaintiff reportedly had chronic pain issues and was treated with Dilantin, Xanax, and OxyContin. He was living alone and estranged from his family. On examination, Plaintiff was alert and oriented, had good memory, motor movements were within normal limits, normal speech, depressed mood, and flat and narrow affect. His intellectual functions were also within normal limits. He was placed on Dilantin, Xanax, Ambien CR, OxyContin, Seroquel, and Lexapro. His medication dosages were gradually increased. Plaintiff initially integrated poorly in the milieu as he was focused on somatic issues. Plaintiff was stable enough to be released on October 18, 2007. His diagnoses were bipolar disorder, opiate dependence, and chronic neck pain. He was assessed with a GAF of 48, with his highest that year estimated at 51. Tr. 902-910.

On November 2, 2007, Plaintiff was admitted due to an exacerbation of depression. Tr. 890-899. He had suicidal ideation, significant mood lability, and had been off some of his medication for a period of several days. Plaintiff was suppose to be taking Dilantin, Xanax, OxyContin, Abilify, and Lexapro but had not been able to get all of his medications due to financial issues. Upon admission, he was alert and oriented, his memory was intact, his motor

movements were within normal limits, his affect was flat and narrow in range, and his mood depressed.  His general fund of knowledge was appropriate to his level of education.  Lab work revealed subtherapeutic levels of Dilantin.  Plaintiff was placed on Lexapro, OxyContin, OxyCodone IR, Abilify, Xanax, and Dilantin.  Once he obtained his normal medications, Plaintiff was stabilized and released home on November 7.  Tr. 890-899.

This pattern recurred in January 2008. Tr. 875-889.  Plaintiff alleged a history of bipolar disorder and severe anxiety.  Tr. 875-877.  He reported many suicidal thoughts and a plan to jump in front of traffic.  Upon admission, Dr. Hiatt confirmed with his mother that he abused Xanax and opiates.  Dr. Hiatt placed him on alcohol detoxification as well as opiate detoxification. He tolerated these well.  Plaintiff's Lexapro was then increased to 20 milligrams. A therapist arranged for placement in a drug treatment residential program called Omart and Plaintiff indicated that he wanted to go there.  However, they would not allow him to go on OxyContin, so he agreed to detox off of it.  Plaintiff was also given Remeron for depression and appetite.  Before Plaintiff could complete treatment, a family member phoned his therapist and indicated that his Grandmother had passed away unexpectedly.  As such, he wished to be discharged on January 25.  He was given prescriptions for OxyContin, Proventil, Tegretol, Dilantin, Ambien, Lexapro, and Remeron SolTab.  Tr. 876.

On May 17, 2008, Plaintiff was hospitalized ostensibly for bipolar disorder and severe respiratory difficulties.  Tr. 858-873.  On admission, there was evidence of noticeable psychomotor retardation as Plaintiff had considerable back pain.  He was also extremely depressed with labile moods and claimed to be frustrated over his mental treatment.  His judgment and insight were poor and his impulsivity was high. A physical exam showed hepatitis

44

C by history, seizure disorder by history, arthritis, chronic pain, and bipolar disorder depressed phase. Plaintiff was given Dilantin, Oxycodone, and Xanax. On May 20, his Oxycodone was replaced with Morphine. Depakote was started on May 21, but discontinued on May 27. He also contracted a respiratory infection and necessitated antibiotics. Plaintiff did recover slowly and began participating more fully in the milieu. He was discharged on May 29, 2008, with a GAF of 50. Tr. 858-873.

On September 19, 2008, Plaintiff needed medication refills. Tr. 846-850. He reported continued back and arm pain. Plaintiff was diagnosed with seizure disorder and chronic back pain and prescribed Xanax, Oxycodone, Percocet and Dilantin. Tr. 846-850.

On October 17, 2008, Plaintiff was having some depression. Tr. 841-845. He reported an appointment with the pain clinic scheduled for November 3. At this time, Plaintiff stated that his pain was a little worse and that he needed medication refills. He also indicated that he had been on Prozac and wanted to restart it. Dr. Chad Sherwood prescribed Dilantin, Percocet, Prozac, Oxycodone, and Alprazolam. Tr. 845.

On November 12, 2008, Plaintiff indicated that he could not get into the pain management clinic in Harrison until January. Tr. 836-840. Dr. Sherwood indicated that he would refill Plaintiff's pain medications until he could get into the clinic, but gave him post dated prescriptions for November 17, 2008. Tr. 839.

On December 19, 2008, Plaintiff complained of pain in his back and arm. Tr. 831-835. Plaintiff stated that he was in need of medication refills. The doctor diagnosed him with chronic pain and seizure disorder and refilled his medications. However, he was advised to follow up

45

with his pain management doctor for future medication.  Tr. 831-835.  He was prescribed Oxycontin, Percocet, Prozac, and Dilantin.  Tr. 834.

On January 15, 2009, Dr. James Hawk wrote a letter to Plaintiff's counsel concluding that Plaintiff was disabled.  Tr. 829.  He stated that Plaintiff's problems seemed to originate from a closed head trauma in 1989, `wherein the lid and puncturing device of a masonry mixer came down on his head and the barrel of the mixer.  Subsequently, he experienced severe disorientation, difficulty focusing, and third degree burns to the right upper arm and axilla. Plaintiff underwent three skin grafts and two nerve surgeries.  Following the head injury, Plaintiff also developed seizures. He noted that Plaintiff continued to experience intermittent seizures that were not controlled via Dilantin.  He indicated that Plaintiff suffered from disorientation with an increased dosage of Dilantin, but a low amount was ineffectual. Dr. Hawk was going to try other medications, but at the present time, Plaintiff could not drive.  He also doubted that even if the majority of his seizures came under control that Plaintiff would not suffer from continued breakthrough seizures that would jeopardize his ability to drive.  He noted that under Arkansas law, people experiencing seizures were not allowed to drive.  Dr. Hawk attributed great vocational significance to Plaintiff's alleged seizure impairment as a major basis for his finding of disability.  Tr.  829.

**IV.    Discussion:**

Plaintiff contends that the ALJ erred in concluding that Plaintiff's and his mother's testimony concerning his subjective complaints was not credible, concluding that Plaintiff's depression and seizure disorders did not constitute severe impairments, failing to afford

46

significant weight to Dr. Gaston's and Dr. Hawk's medical source statements, and determining Plaintiff retained the RFC to perform a range of sedentary work.

### A.   Subjective Complaints:

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing her reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work). An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.

*Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

### 1.   **Physical Impairments:**

It is clear to the undersigned that the ALJ properly considered plaintiff's subjective complaints, individually and in combination, prior to determining that plaintiff's complaints were not totally credible.  Plaintiff did have a history of DDD.  Tr. 198-201.  In December 2005, an MRI of Plaintiff's lumbar spine revealed a small central disk herniation at the L5-S1 level.  Tr. 636, 815.  An MRI of his thoracic spine showed old compression injuries at the T5 and T7 levels with no acute injuries noted or soft-tissue herniation apparent.  Tr. 637, 815.  Physical examinations were repeatedly normal, suggestive of minimal physical limitations.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  On most occasions, he exhibited full motor strength, a negative straight leg raise test, normal gait and balance, no loss of sensation, no muscle atrophy, and minimal tenderness.  Tr. 203-205, 207, 224-227, 228-251, 254-257, 261, 483, 780, 777-778, 786-787.  Many times he walked out of the hospital without difficulty, after he obtained prescriptions for narcotics.  In fact, Dr. Cheney opined that Plaintiff's MRI results were not significant enough to explain the level of pain he claimed to be experiencing.  Tr. 805.  Therefore, although it is clear that plaintiff suffers with some degree of pain, he has not established that he is unable to engage in any gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff

48

did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

Records do indicate that plaintiff was prescribed a variety of narcotic medications to treat his pain. And, Plaintiff alleges that the ALJ erred in allowing his drug-seeking behavior and addiction to pain medication to cloud his judgment in this case. We disagree.  Treatment notes dated as early as 1996 indicate that Plaintiff was denied narcotic pain medication due to a history of abuse of analgesics and pain medication.  During the relevant time period, the record is replete with reports of chronic severe pain and prescriptions for various narcotic pain medications. Several of his treating doctors attributed Plaintiff's symptoms primarily to drug-seeking behavior.  Tr. 206,  218, 228-229, 231, 238, 254, 265, 286.  *See* Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997)(noting that ALJ may consider evidence that a claimant has exaggerated his symptoms when evaluating claimant's subjective complaints of pain).  It was not uncommon for Plaintiff to present in the ER requesting specific narcotic pain medications, refusing prescriptions for non-narcotic pain medications.  He also repeatedly phoned his doctor to request early medication refills or post dated prescriptions.  Tr. 281-282, 295, 302-304, 320, 448, 452, 462, 557-558, 644, 660, 705, 716, 719, 720, 727, 774-775.  *See Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (holding that drug-seeking behavior discredited Plaintiff's allegations of disabling pain).  At one point, Dr. Stone acknowledged that Plaintiff was phoning his office twice per week either requesting medication changes or additional narcotics.  Tr. 774-775.  Plaintiff was also obtaining narcotic pain medications from more than one doctor.   When one doctor refused his request for a refill, he merely called another doctor or presented in the ER stating that he was out of medication.  Tr. 315-325, 557-558.  At one point, his mother kicked

49

him out of her home and notified his doctor that he was abusing prescription drugs and obtaining them from multiple doctors.  Tr. 320.

Records also indicate that he increased his own medication dosages and overdosed on at least three occasions.  Tr. 441, 462, 509-516, 612-621, 623-634, 648.  Plaintiff's own treating doctors and dentist even opined that he was dependent on these pain medications.  Tr. 298-299, 320, 449, 495.  Further, Plaintiff was arrested on at least one occasion for suspicion of drug trafficking.  Tr. 397-400.  *Mooney v. Shalala*, 889 F.Supp. 27, 33-34 (D. N. H. 1994) (concluding that selling drugs can be considered substantial gainful activity).  At the time of his hospitalization in August 2006, Plaintiff's brother-in-law indicated that Plaintiff had stashes of Methadone and other drugs.  Tr. 624.  As such, we believe Plaintiff exaggerated his symptoms in order to obtain narcotic pain medications.

Records do make clear that Plaintiff was also suffering from bilateral carpal tunnel syndrome.  Nerve conduction studies performed in December 2004 were consistent with a diagnosis bilateral carpal tunnel syndrome, right greater than left, and severe left ulnar nerve slowing at the elbow.  Tr. 283.  Further, Plaintiff fell and sustained a left radial and ulnar distal fracture.  Tr. 375-396.  In August, Plaintiff underwent open reduction and internal fixation of the right distal radius fracture, as well as closed reduction of the left radius fracture.  Tr. 360-364, 547-555.  Although he suffered a post surgical infection, Plaintiff did ultimately recover from his injuries.  Tr. 329-342, 344-352, 431-433.  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  In late August 2004, Dr. Oliver noted that Plaintiff's wrist splint was quite abused.  Tr. 435.  We also note he continued to work as a brick mason, in spite of his

50

alleged severe pain.  Therefore, while we do not doubt Plaintiff suffered some pain from his carpal tunnel syndrome, we can not say that this condition was as disabling as alleged.

## 2.   **Non-Severe Impairments:**

As for Plaintiff's alleged seizure disorder, we have reviewed the medical evidence and conclude  that it does not support a finding that this condition was severe.  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a).  If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir.2007).  It is the claimant's burden to establish that his impairment or combination of impairments are severe.  *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000).  Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard.  *See, e.g., Page*, 484 F.3d at 1043-44; *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003); *Simmons,* 264 F.3d at 755; *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir.1997); *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir.1996).

Initially, we note that Plaintiff seemed to experience a seizure each time he was arrested. This behavior got him out of jail and into the emergency room where he could obtain additional pain medication.  Further, although Plaintiff alleged to experience seizures at various times throughout the relevant time period, his doctors were not entirely certain that Plaintiff was actually suffering from a seizure disorder.  In fact, after observing Plaintiff's alleged seizure

AO72A
(Rev. 8/82)

activity, Dr. Sherwood concluded that he was faking and diagnosed him with pseudo seizures. He advised Plaintiff to stop his game and get back into bed, at which time Plaintiff did as he was told..  Although he contended that he was not playing around, an EEG, MRI, and CT scan of Plaintiff's brain were all within normal limits and neurological evaluations revealed no abnormalities. Tr. 306, 210-214, 218, 228-229, 231, 238, 254, 265-274.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  Dr. Maddox also concluded that Plaintiff's seizure disorder was a ruse.  Tr. 219.

Each time Plaintiff presented with complaints of an alleged seizure, it was also noted that his Dilantin level was subtherapeutic, indicating that Plaintiff had been noncompliant with his medication. Tr. 253, 265-274, 441, 509, 623-634, 648, 678-680, 799-800, 809, 813, 891.  *Brown v. Barnhart*, 390 F.3d 535, 540-541 (8th Cir. 2004) (holding that the ALJ properly discounted treating physician's opinion where record showed the plaintiff was non-compliant with prescribed treatment without good reason).  In fact, pharmacy records show that Plaintiff filled fewer than 20 prescriptions for seizure control medications between September 10, 1997, and October 2006.  Further, in 2003, Plaintiff actually began experiencing fewer seizures.  Tr. 246, 285, 288, 441, 490-491, 648, 798-800.   Accordingly, we do not believe the ALJ erred in concluding that Plaintiff's seizure disorder was non-severe.

Plaintiff also contends that he suffers from a disabling level of depression and anxiety. Initially, we note that the signs and symptoms of drug abuse are similar to those associated with mental illness.   Alterations in mood, erratic behavior, mental cloudiness, confusion, inability/excess sleep, anxiety, hyperactivity/increase alertness, suicidal tendencies, and

AO72A
(Rev. 8/82)

alterations in physical outlook are all symptoms of prescription drug abuse.  *See* Mayo Clinic, *Prescription Drug Abuse*, *at* http://www.mayoclinic.com/health/prescription-drug-abuse (Oct. 22, 2010).  After reviewing the entire record before this Court, we find Plaintiff's alleged mental impairments to be more consistent with symptoms of his drug addiction than true mental impairments.

While Plaintiff was prescribed Xanax and other anti-depressants, and was hospitalized on several occasions with diagnoses of depression, it is also clear that Plaintiff's hospitalizations for depression were also precipitated by his being out of pain medication or experiencing a drug overdose.  When Plaintiff was taking his medication as prescribed, mental examinations conducted by Plaintiff's doctors were repeatedly normal.  Tr. 215-219, 315.  Further, when he was out of medication or had overdosed and normal pain medications and anti-depressants were reinstated, Plaintiff normalized and was released home in stable condition.  Tr. 445, 841, 858-873, 875-889, 890-899.

While the records do bear out that Plaintiff's hospital entrance and exit GAF scores were low, we believe these scores to be indicative of Plaintiff's having been overdosed or without his medications and in withdrawals, rather than him actually being depressed.

Further, aside from the hospitalizations noted, Plaintiff did not seek out mental health treatment.  Instead, he merely requested medication and medication refills from his treating doctors.  This lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

53

Although Plaintiff contended that he had been previously diagnosed with bipolar disorder, we can find no evidence to support this claim. It seems that the doctors in the hospital merely took Plaintiff's word for this and incorporated this diagnoses into their own. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (opinion of consulting physician is not entitled to special deference, especially when it is based largely on claimant's subjective complaints). Therefore, we do not believe the ALJ erred in concluding that Plaintiff's mental impairment was non-severe.

### 3.      **Medication Dosages and Side Effects:**

We are cognizant of the fact that Plaintiff had been prescribed a combination of narcotic and prescription medications to include, Xanax, OxyContin, Percocet, Prozac, Dilantin, and Alprazolam. It is clear to the undersigned that the level of pain suffered by Plaintiff did not warrant the dosages of medication prescribed. As previously stated, the objective medical evidence does not support Plaintiff's subjective complaints. Accordingly, we do believe that Plaintiff's dosage of medication is more a product of choice (addiction) than necessity (pain).

Although these medications taken in large dosages would likely impact an average person's ability to perform work-related activities, we note that Plaintiff has built up a tolerance to these medications. This is evidenced by him having increased his own dosages, overdosing, requesting medication changes, sometimes obtaining multiple prescriptions for the same medication, and consistently requesting early refills. It takes more and more medication for him to experience the side effects experienced by someone strictly using these medications as prescribed for true pain relief. Accordingly, we can not say that Plaintiff's use of these medications would result in the same limitations as would occur with someone who was not

54

accustomed to taking them.  What, if any, limitations these medications would impose on Plaintiff is answered by Plaintiff, himself.  On February 11, 2004, Plaintiff actually reported that he was able to work as a brick mason, while taking all of his pain medications.  Tr. 286.  Records indicate that he continued working until at least March 2004, all the while taking these or similar medications.  Tr. 285, 293.  Accordingly, we can not say that the side effects of Plaintiff's prescription medications rendered him incapable of performing work-related activities.

4.   **Activities:**

Plaintiff alleged disabling limitations, however, he was able to perform numerous activities of daily living including doing the laundry, washing the dishes, changing the sheets, ironing, vacuuming/sweeping, taking out the trash, performing home repairs, washing the car, shopping for groceries and clothing, running errands to the bank and post office, preparing sandwiches, paying bills, using a checkbook, counting change, attending church, and playing video games.  (Tr. 145-146).  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).   He also worked as a brick layer performing heavy work after his alleged onset date.  Tr. 70.  Further, in January 1997, plaintiff admitted to receiving unemployment benefits.  Tr. 290.  Acceptance of unemployment benefits,

which entails an assertion of the ability to work, is facially inconsistent with a claim of disability. *See Salts v. Sullivan*, 958 F.2d 840, 846 n. 8 (8th Cir. 1992).

We also note that Plaintiff re-injured himself on several occasions while changing a tire, climbing onto his roof to clean his chimney, relieving himself off of his deck, falling off a scaffold, loading a shotgun, and unloading a motorcycle.  Tr. 206-209, 228-230, 253-254, 254-257, 322, 805.  In addition, after shooting himself in the foot, Plaintiff admitted that he had been out having coffee rather than elevating his foot, as his doctor had directed him.  Tr. 320.  These are clearly not the type of activities one would expect to be reported by someone alleging severe and disabling pain.

### 5.    Testimony:

Plaintiff's mother, Carolyn Davis, testified on his behalf.  Tr. 944-948.  She testified that Plaintiff was experiencing approximately seven grand mal seizures per month and three to four petit mal seizures per day.  Ms. Davis did not really feel that his seizure disorder had ever been under control.  We find that the ALJ properly considered Ms. Armstrong's testimony, but found it to be unpersuasive, as it is not supported by the overall record.  This determination was well within the ALJ's province.  *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, we find that the ALJ properly determined that plaintiff's daily activities were inconsistent with his subjective complaints of disabling impairment.  His subjective complaints were also inconsistent with the medical evidence.

56

B.     **The ALJ's RFC Assessment:**

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,*  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ considered plaintiff's subjective complaints, his medical records, the statements of Plaintiff's treating doctors, and the RFC assessments of two non-examining doctors before determining Plaintiff's RFC.  On December 3, 2002, Dr. Ronald Crow reviewed Plaintiff's medical records and concluded that Plaintiff's physical impairment was non-severe.  Tr. 503-504.

On March 10, 2005, Dr. K. Adametz completed a RFC assessment.  Tr. 473-482.  After reviewing Plaintiff's medical records, he concluded that Plaintiff could perform light work

57

involving occasional rapid, repetitive motions of the wrists due to carpal tunnel syndrome.  Tr. 476.

We are cognizant of Dr. Gaston's July 2004 physical capacity assessment.  However, after reviewing this assessment, it is clear that Dr. Gaston's restrictions were based on Plaintiff's then recent compression fractures to his thoracic spine and his radial and ulnar fractures.  We can find no indication in the record that Dr. Gaston's limitations remained in effect at the time of the ALJ's decision.

Likewise, we have reviewed Dr. Hawk's 2009 letter regarding Plaintiff's seizure disorder.  However, as we have already found substantial evidence to support the ALJ's determination that Plaintiff's seizure disorder was non-severe, we do not believe Dr. Hawk's assessment was entitled to significant weight.  It is clear Dr. Hawk believed Plaintiff's seizures to have begun after he was injured in an on-the-job accident in 1989, involving a concrete mixer.  However, both Plaintiff and his mother have indicated that his seizures did not begin until after the car wreck in April 1997.  Tr. 919, 922.  However, Plaintiff's EEGs, MRIs, and CT scans were all within normal limits.  Neurological exams were also unremarkable.  Therefore, given the fact that Plaintiff's treating doctors believed him to be malingering and the fact that Plaintiff failed to take his anti-seizure medication as prescribed, we do not find that the remainder of the evidence supports Dr. Hawk's assessment.

We can also find no evidence to support plaintiff's allegation of disability due to mental limitations.  As previously noted, we find Plaintiff's mental impairments to be more a symptom of his drug abuse, than a true mental illness.  It seems apparent that Plaintiff's alleged mental symptoms are at their worst when he is either out of medication or has taken more medication

AO72A
(Rev. 8/82)

than prescribed.  Therefore, we can not say that Plaintiff suffers from a true mental impairment that would impact his ability to perform work-related activities.

Accordingly, we find that substantial evidence supports the ALJ's determination that plaintiff could perform a range of sedentary work involving stand and walking for two hours per day and only occasional fine manipulation, climbing, balancing, stooping, kneeling, crouching, and crawling.  Tr. 32.

### C.   <u>Vocational Expert's Testimony:</u>

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision).  The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

In the present case, the vocational expert testified that a person of plaintiff's age, education, and past experience, who lift and carry ten occasionally; frequently less than ten; stand and walk for two hours; sit for six hours; occasionally do rapid repetitive motions with both wrists; and, occasionally climb, balance, stoop, kneel, crouch, crawl, could perform work as a vehicle escort driver.  (Tr. 950-952).  Clearly, the hypothetical posed to the expert encompasses all of the impairments that the ALJ found were substantially supported by the record as a whole.

59

While we note Plaintiff's contention that he could not perform this job due to his seizure disorder, we have considered the evidence and conclude that Plaintiff's seizure disorder is non-severe.  As such, we do not find that seizure precautions are necessary.

**V.**    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 25th day of October 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)